IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

KRISTIN M. LEVE,

      Plaintiff,

vs.                                No. 02cv1551 DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Leve's) Motion to Reverse or in the Alternative to Remand for a Rehearing **[Doc. No. 13]**, filed June 6, 2003, and fully briefed on September 4, 2003. The Commissioner of Social Security issued a final decision denying Leve's claim for disability insurance benefits and supplemental security income benefits. Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to reverse is not well taken and will be DENIED.

### I. Factual and Procedural Background

Leve, now 33 years old, filed her application for disability insurance benefits on January 21, 1998, and her application for supplemental security income benefits on August 4, 1997, alleging disability since June 20, 1994, due to major depression, post traumatic stress disorder and borderline personality disorder. Tr. 330, 333. On January 24, 2000, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding that Leve "has major depression and borderline personality disorder impairments which are 'severe' impairments within the meaning of

the Regulations."  Tr. 16.  However, the ALJ found Leve's impairments did not meet or medically

equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  Tr. 17.

Specifically, the ALJ considered Listing 12.04 (Affective Disorders) and 12.08 (Personality

Disorders).  *Id.*  The ALJ further found Leve retained the residual functional capacity (RFC) for

"a wide range of simple, unskilled work at all exertional levels."  Tr. 20.  As to her credibility, the

ALJ found Leve was not a fully credible witness, and the statements regarding the functional

effects of her condition were not fully accurate.  Tr. 19.

 Leve filed a Request for Review of the decision by the Appeals Council.  The Appeals

Council denied Leve's request for review of the ALJ's decision.  Leve then appealed the final

decision to the United States District Court.  Tr. 378-380.  The Commissioner filed an unopposed

Motion to Reverse and Remand which the district court granted on November 14, 2001.  Tr. 383.

The ALJ held a supplemental hearing on September 19, 2002, and rendered an unfavorable

decision on November 13, 2002.  The decision of the ALJ became the final decision of the

Commissioner for judicial review purposes.  Leve seeks judicial review of the Commissioner's

final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final

decision is supported by substantial evidence and whether he applied correct legal standards.

*Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992).

Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395

(10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record

or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

Moreover, "all of the ALJ's required findings must be supported by substantial evidence,"

*Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence

of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291

(10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must

discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative

evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while

the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States*

*Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must

meticulously examine the record as a whole, including anything that may undercut or detract from

the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington*

*v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a

claimant must establish a severe physical or mental impairment expected to result in death or last

for a continuous period of twelve months which prevents the claimant from engaging in

substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing

42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the

Commissioner to evaluate five factors in a specific sequence in analyzing disability applications.

20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the

Commissioner finds the claimant is not disabled. *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse, Leve makes the following arguments: (1) the ALJ failed to support his RFC finding; (2) the ALJ erroneously concluded that she was not credible; and (3) the ALJ failed to carry his burden of proof at step five of the sequential evaluation process.  The Court will address the credibility issue first.

## A.  The ALJ's Credibility Finding

Leve contends the ALJ concluded she was not credible "for reasons set forth in the body of the decision."  Pl.'s Mem. in Supp. of Mot. to Reverse at 8.  However, Leve argues "there is absolutely no discussion of credibility anywhere in the body of the decision."  *Id.*

Credibility determinations are peculiarly the province of the finder of fact and will not be upset when supported by substantial evidence.  *Diaz v. Secretary of Health and Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990).  As the trier of facts, the ALJ is optimally positioned to observe and assess witness credibility.  *Casis v. Secretary of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).  "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Huston v. Bowen,* 838

F.2d 1125, 1133 (10th Cir. 1988).  However, in arriving at a credibility determination, a

formalistic factor-by-factor recitation of the evidence is not required, but rather, the ALJ need

only set forth the specific evidence he relies on in evaluating a claimant's credibility.  *Qualls v.*

*Apfel*, 206 F.3d 1368 (10th Cir. 2000).

> In his November 13, 2002 decision, the ALJ found:

> The medical evidence indicates that the claimant has Major Depression with dysthymia, a borderline personality disorder, and a possible post-traumatic stress disorder, impairments that are severe within the meaning of the Regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  The claimant has a longstanding depression, aggravated intermittently by situational stressors.  She is able to care for her personal needs (Ex. 3F).  Her insomnia responds well to medication (Ex. 20F).  She testified that she has difficulty leaving the house for weeks at a time, but has never been diagnosed with agoraphobia.  I conclude that she has at most slight restrictions in activates (sic) of daily living.  She claims to have difficulty concentrating, but vocational testing in 1996 showed that she had an above average IQ, was able to attend to tasks, and was highly motivated (Ex. 1E).  She does not have major memory problems (Ex. 3F).  I conclude that she has at most moderate limitations in concentration, persistence and pace.  Her therapist characterized her as a "connector," concluding that she attaches easily and well to people (Ex. 15F/10).  She told the consultative psychiatrist that she relates well to others (Ex. 3F).  She has at most a mild limitation in social functioning.  She had two episodes of decompensation, one on her alleged onset date and one in November 2000, because she stopped taking her medications.  Therefore, her impairments do not satisfy the "B" criteria for §§ 12.04, 12.06 or 12.08.  She does not have the type of marginal adjustment that even a minimal increase in mental demands would be predicted to cause her to decompensate, to satisfy the "C" criteria of §§ 12.04 or 12.08.  Although she testified that she was agoraphobic, she carries no medically documented history of a complete inability to function outside the are (sic) of the home, to satisfy the "C" criteria of § 12.06.  I conclude that the claimant has failed to establish that her impairments, even in combination, meet or equal the requirements of any listed impairment.

> \* \* \* \* \* \* \* \* \* \* \*

> The claimant testified that she now lives in an apartment obtained through a homeless program.  She was attending school at TVI, but said that she quit because of fear of letting someone down.  She claimed to have a fear of people and being outside, but the notes from her doctors and therapists do not discuss this symptom and she has never been diagnosed as agoraphobic.  She becomes easily overwhelmed.  She says she sleeps too much or not enough.  However, her medical records indicate that her sleep is controlled when she takes her medications as prescribed (Ex. 20F).  She says she does not drive because she is too afraid to learn to drive.  She takes medication for depression and insomnia, which are effective in controlling her symptoms most of the time (Ex. 16F).  She does not complain of side-effects.  After reviewing the records as a whole, I conclude that she has some

difficulty coping with situational stressors, but that she has remained stable on her
medications, and able to perform some work, for all continuous 12 month periods at issue.

Tr. 330-331(emphasis added).  The ALJ found Leve not credible and cited to the record.  Leve

testified she was unable to work because she had "an inability to leave the house" and "a fear of

being outside, being around people."  Tr. 361.  Leve also testified that she would not classify her

problem as agoraphobic.  *Id.*  The ALJ found her not credible because her therapist's records

indicated she was a "connector" and attached easily and well to people.  The ALJ also found her

complaints not credible because she had reported to one of the psychiatrists that she related well

to others.  Leve also testified she had problems concentrating.  However, the ALJ cited to the

record to discredit this claim.  Unlike the boilerplate language rejected in *Kepler v. Chater*, 68

F.3d 387, 391 (10th Cir. 1995), the ALJ in this case set forth the specific evidence he relied on in

evaluating Leve's credibility.   Accordingly, the Court finds that the ALJ's credibility

determination is adequate.

## B.  RFC Finding

Residual functional capacity is defined as "the maximum degree to which the individual

retains the capacity for sustained performance of the physical-mental requirements of jobs."  20

C.F.R. pt. 404, subpt. P, app. 2, § 2000.00(c).  In determining a claimant's physical abilities, the

ALJ must "first assess the nature and extent of [the claimant's] physical limitations and then

determine [the claimant's] residual functional capacity for work activity on a regular and

continuing basis."  20 C.F.R. § 404.1545(b).  In this case, the ALJ found Leve had no exertional

limitations.  Tr. 333.  Leve does not dispute this finding.

The ALJ then evaluated Leve's mental RFC.  In determining a claimant's mental RFC, the

ALJ "must follow the procedure for evaluating mental impairments set forth in 20 C.F.R. §

6

404.1520a and the Listing of Impairments and document the procedure accordingly." *Cruse v. United States Dep't of Health & Human Servs.*, 49 F.3d 614, 617 (10th Cir. 1995), *see also Winfrey v. Chater*, 92 F.3d 1017, 1024 (10th Cir. 1996).  The ALJ documents the procedure by completing a PRT form, which the ALJ must attach to his written decision.  "[T]he record must contain substantial competent evidence to support the conclusions reached on the PRT form [, and] if the ALJ prepares the form himself, he must 'discuss in his opinion the evidence he considered in reaching the conclusions expressed on the form.'"  *Winfrey*, 92 F.3d at 1024 (quoting *Cruse*, 49 F.3d at 617-18).

As previously noted, the ALJ found Leve had "at most slight restrictions in activates (sic) of living," "at most moderate limitations in concentration, persistence and pace," "at most a mild limitation in social functioning," and "she had two episodes of decompensation, one on her alleged onset date and one in November 2000, because she stopped taking her medications."  Tr. 330.  The ALJ related his conclusions to the evidence.  The ALJ found Leve had the following mental RFC:

> Her doctors (sic) in 1998 stated that he felt that she could not work full time "at this time," but this was only a few months after her discharge from the partial hospitalization program (Ex. 9F).  This does not establish an inability to work which persisted for a continuous 12-month period.  Her current doctor also states that the claimant is unable to work, for the next 6 months due to anxiety symptoms surrounding work.  Again this does not establish a persistent limitation and this opinion is at odds with the remainder of the record, which indicates that the claimant is stable on medications.
>
> Accordingly, the undersigned finds the claimant retains the following residual functional capacity during all continuous 12-month periods at issue: she has no exertional limitations. She has a fair to moderate ability to relate to others, but has significant limitations in dealing with the public.  She is significantly limited in her ability [to] deal with work related stresses.  She had a fair to moderate ability to maintain attention, understand and follow simple instructions and behave in a reliable manner in the workplace (Exs. 3F and

7F).  Her symptoms are generally controlled with medication and she has difficulty associated with situational stressors, which are transient.

Based upon the claimant's residual functional capacity, the Administrative Law Judge must determine whether the claimant can perform any of her past relevant work.  The phrase "past relevant work" is defined in the Regulations at 20 C.F.R. §§ 404.1565 and 416.965.  The work usually must have been performed within the last 15 years or 15 years prior to the date that disability must be established.  In addition, the work must have lasted long enough for the claimant to learn to do the job and meet the definition of substantial gainful activity.

The evidence in this case establishes that the claimant has no past relevant work.

Tr. 331-332.  The ALJ also consulted with a vocational expert (VE).  The ALJ presented the following hypothetical to the VE.

ALJ:    I'd like for you to consider the following hypothetical: that there are no vocational-- or exertional limitations, that the person is 32.

. . . that she has a GED, some prior work which you've been provided information with, that it's been eight years since she has had that.  Assume that the person has a limited but satisfactory ability in all of the following areas: limited but satisfactory-- I would equate with fair or moderate to relate to co-workers, deal with the public, deal with work stresses, function independently, maintain attention and concentration, follow detail to complex instructions, follow simple instructions, behave in an emotional stable manner, and demonstrate reliability.  Would there be a body of work left or jobs available for a person with those limitations?

A:      Based on those limitations such an individual could still perform past relevant work of the claimant as a housekeeping cleaner. This is unskilled light occupation.

Q:      Is there other work available?

A.      Yes.

Q:      Is that a broad spectrum of work or limited few jobs?

A:      It's pretty broad spectrum.

Q:      Okay.

* * * * * * * * *

Q:      All right.  I would like to change the hypothetical a bit as follows: that the ability to relate

to co-workers remains limited but satisfactory.  The ability to deal with the public

becomes seriously limited but not precluded which I equate with poor, that the ability to    deal

with work stresses is also seriously limited but not precluded.  The ability to

function independently, the ability to maintain attention and concentration to remain       limited

but satisfactory, the ability to follow detail to complex instructions is seriously       limited but not

precluded.  The ability to follow simple instructions remains limited but       satisfactory, emotional

stability limited but satisfactory and reliability limited but             satisfactory.  What does those

changes do to the availability of work?

A:      Okay.  It would still allow the past relevant work of housekeeping cleaner, still would

allow a pretty broad range of unskilled work of varying exertional demands with the

exception of the public work.

Tr. 371-373.  Based on the evidence and the VE's testimony and opinion, the ALJ concluded

Leve was not disabled.

Leve contends the ALJ's mental RFC determination is not supported by the record.  Leve

contends the ALJ disregarded "the substantial evidence of record" supporting her testimony

regarding her mental impairment when he determined her RFC.  Pl.'s Mem. in Supp. of Mot. to

Reverse at 4-5.  Leve also claims "the record is replete with evidence supporting her testimony

9

regarding her mental impairment." *Id.* at 5.   Leve sets forth the following evidence she claims

supports her mental impairment: (1) Dr. Rene Gonzalez' consultative evaluation; (2) Dr. Jill

Blackharsh's evaluation and letter of disability; (3) her hospitalization at University of New

Mexico Mental Health Center (UNM-MHC); (4) her hospitalization in a partial hospitalization

program in the summer of 1998; and (5) Dr. Feierman's letter dated August 13, 1998.

      The Court is mindful that its review is limited to evaluating whether the factual findings

are supported by substantial evidence in the record as a whole and whether the ALJ applied the

correct legal standards.   *Castellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1028

(10th Cir. 1994).   Leve's arguments essentially seek a reweighing of the evidence before the

agency, which the Court cannot do.   *See Hamilton v. Secretary of Health & Human Servs.*, 961

F.2d 1495, 1498 (10th Cir. 1992).   Although the Court must "meticulously examine the record as

a whole, including anything that may undercut or detract from the ALJ's findings, in order to

determine if the substantiality test has been met," *Washington*, 373 F.3d at 1439,  it is the

province of the Commissioner to resolve conflicting evidence.   *See Hargis v. Sullivan*, 945 F.2d

1482, 1486 (10th Cir. 1991).   The record reflects the following:

**1.  Summary of Psychological/Psychiatric/Vocational Evidence**

**a.  Records for 1995**

      On **June 1, 1995**, Leve went to UNM-MHC-PES for a medication refill.  Tr. 204.  Leve

reported she was still feeling some depression.  Tr. 204.  Leve was appropriately dressed and

groomed, she was oriented in all spheres, her speech was clear and coherent, her thoughts were

organized with no delusional thinking or suicidal or homicidal ideation, her memory was normal,

and insight and judgment were good and adequate, respectively.   The nurse assigned Leve a GAF

score of 50 (serious symptoms).[1]  The nurse instructed Leve to stay on Desipramine (antidepressant) and Ativan (used in the treatment of anxiety).

On **June 12, 1995**, Leve was seen at UNM-MHC.  Tr. 203.  Leve reported she was applying for General Assistance, Medicare and Medicaid.  She reported she had no side effects to the medications.  Her mental status examination was unremarkable.  The physician instructed Leve to return in one to two months.

On **June 19, 1995**, Leve telephoned UNM-MHC to report she was not doing well and could not wait until August to be seen.  Tr. 203.  She was instructed to come to the clinic the next day.

On **June 20, 1995**, Leve returned to UNM-MHC as instructed.  Tr. 203.   The physician increased the dosage of Desipramine and Ativan.

On **June 30, 1995**, Leve's therapist was graduating and thus closing her case.  Tr. 202. Leve expressed her feeling regarding the termination, stating "how bad termination at this point was."  *Id.*   The therapist instructed Leve to continue with therapy on an emergency basis until "pt's self-referral to other therapist."  *Id.*  Leve reported she was negotiating with DVR to receive more funds for continuation of more therapy.

---

[1] Global Assessment of Functioning (GAF score) is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning."   American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th ed. 2000) (DSM-IV-TR).  The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death.).
DSM-IV-TR at 34.

On **August 8, 1995**, Leve returned to UNM-MHC for medication.  Tr. 201.  Leve reported having an appointment at the Mood Clinic the following Monday.  Leve's mental status examination was essentially normal.  The physician assessed Leve as having depression and anxiety.

On **August 14, 1995**, Leve returned to UNM-MHC.  Tr. 200.  The physician noted Leve was "doing well despite recent stressors."  *Id.*  Leve reported she was receiving General Assistance and food stamps.  Leve also reported she was receiving therapy from Michael Brennan.  The physician noted he hoped Leve's stability would increase so she could return to work or attend school within five months.  The physician assigned Leve a GAF score of 65 (some mild symptoms).

On **September 14, 1995**, Leve returned for her follow-up at UNM-MHC.  Tr. 199.  Leve reported she was "still not doing much" and her anxiety was "way down."  *Id.*  Leve also reported she was "not using Ativan much."  *Id.*  Leve commented to the physician that she wondered if she was on the verge of depression but did not know why and was having trouble motivating herself.  Leve complained she was not attending DTP group because she was tired of hearing everyone's problems but was still seeing Michael Brennan. The physician assessed Leve as having depression and "not suffering from anxiety at present."  *Id.*  The physician instructed her to stay on her medications and return in one month.

On **October 16, 1995**, Leve returned to UNM-MHC and reported taking her Desipramine 250 mg nightly.  Tr. 198.  Leve reported this dose "had been maximally helpful."  *Id.*  Leve denied any suicidal thoughts but was "struggling with decisions to be made" and continued to work on

this in therapy.  The physician instructed Leve to continue with the Desipramine, therapy and return in one month.

On **November 30, 1995**, Leve returned for her follow-up appointment.  The physician completed a Plan Management on this visit.  Tr. 197. The physician noted Leve reported "the Desipramine is really allowing her to be stable."  *Id.*  Leve also reported taking Ativan occasionally for severe anxiety.  The physician reported "no serious lasting depressive episodes." *Id.*  The physician assessed Leve's problems as "low mood, anxiety, repetivity."  *Id.*  The physician instructed Leve to continue with her medications and her therapy.  The physician informed Leve that a new physician would take over her care and referred her to a family physician for primary care.

**b.  Records for 1996**

On **January 16, 1996**, Michael Brennan, Leve's therapist, wrote to Dave Harbin with the Division of Vocational Rehabilitation (DVR) in response to Mr. Harbin's request for information concerning Leve.  Tr. 148-149.  Mr. Brennan informed Mr. Harbin that he had done an intake interview of Leve in early July of 1994.  At that time, Leve was requesting admission to University of New Mexico Mental Health Center Day Treatment Program.  Mr. Brennan remained her therapist until the Day Treatment Program was closed.  However, Leve sought private counseling sessions from Mr. Brennan and had been seeing him privately since August of 1995.  Mr. Brennan reported Leve had been attending weekly sessions and had "moved out of a housebound depression and had begun to take steps toward becoming functional and independent again."  Tr. 149.  Mr. Brennan described Leve as "bright and motivated, anxious, and in need of

assistance." *Id.*  Mr. Brennan opined that the fact Leve had contacted DVR was very significant in her process.  Mr. Brennan diagnosed Leve as having Major Depression, severe and recurrent.

On **March 20, 1996**, David Montoya, a Certified Vocational Evaluator submitted a Vocational Evaluation report to Dave Harbin.  Tr. 78-86.  According to Mr. Montoya's report, Leve "underwent vocational testing at the offices of Crawford Disability Management Services on February 22, 1996."  Tr. 78.  The purpose of the examination was to measure vocational aptitudes, rehabilitation potential, and interests.

At that time, Leve was twenty-five years old.  She reported being divorced with no dependent children and was receiving $231.00 in General Assistance and $119 in food stamps. Leve "report[ed] having no physical limitations whatsoever" but claimed she had been diagnosed as having major clinical depression and anxiety disorder as a result of years of both physical and emotional trauma.  *Id.*  She also reported she had been hospitalized in 1987 for 2 days and in 1994 for five days due to her psychiatric condition.  However, she indicated she had been stable on medications for the last six to nine months.

The testing results indicated Leve's performance was within the bright normal range.  Tr. 81.  According to the evaluator, this indicated "reasoning capabilities at a level which would be conducive to pursuing employment or training situations to the professional level."  *Id.*  Leve demonstrated excellent verbal reasoning capabilities and her overall literacy was beyond 12th grade, above her educational attainment level.

Mr. Montoya also reported Leve arrived promptly for her appointment, was cooperative, and her self-presentation was sound with respect to dress, grooming, and personal hygiene.  Leve demonstrated "a high degree of competence with regard to comprehending and following verbal

14

instructions, produced work of good quality, exhibited excellent levels of productivity, attended well to all tasks presented, and appeared highly motivated.  Tr. 81.

Mr. Montoya concluded Leve "presented as an excellent candidate to benefit from formal training" and "[h]er functioning indicate[d] a high potential for success in formal scholastic environments, including a two year certificate, Associate of Arts Degree, and Baccalaureate."  Tr. 82.

On **May 31, 1996**, Mr. Brennan wrote to DVR and reported Leve had attended four sessions during May.  Tr. 147.  Mr. Brennan reported Leve continued to struggle with motivation and depression which he attributed to a recent medication change.  Mr. Brennan also noted Leve was moving in with a friend and was dealing with her fears associated with the changes.

On **June 28, 1996**, Mr. Brennan reported to DVR that Leve had attended three sessions in June "where she initially presents very excited about her move out of mother's apartment into a peer roomate (sic) situation."  Tr. 146.  Mr. Brennan described Leve's mood and affect as "markedly improved" and "she reports some lessening of her depression."  *Id.*  Mr. Brennan also noted Leve continued to struggle with motivation and self-doubt but was taking steps that "have enormous significance."  *Id.*

On **July 26, 1996**, Mr. Brennan's report to DVR indicated Leve needed to continue with therapy and advocated for more sessions since Leve only had one authorized session left.  Tr. 145.  At that time, Leve was preparing to take her GED examination and enroll in school.

On **October 31, 1996**, Mr. Brennan wrote to DVR and reported Leve had attended three sessions in October which centered on her losing her General Assistance benefits which made her feel victimized again.  Tr. 135.  Mr. Brennan also noted Leve was dealing with "motivation to

move out of ambivalence and take charge of own life, being tired of disappointment found in dependence on mother, new sense of competence, GED pretests, with formal test now planned for November." *Id.* However, Mr. Brennan reported Leve "continues to move at own pace and is making progress in how she copes with all." *Id.*

On **November 30, 1996**, Mr. Brennan reported to DVR that Leve had only attended one session in November, but she was pleased she had completed her GED. Tr. 133.

On **December 27, 1996**, Mr. Brennan reported to DVR that Leve had only attended one session in December due to transportation problems. Tr. 132. Mr. Brennan reported Leve "seemed very pleased with GED scores and commented 'my confidence is over ridden (sic) by my fears of taking too much on' . . . which I believe is a statement around her need to take small steps." *Id.* Finally, Mr. Brennan opined Leve "continues to move forward." *Id.*

**c.  Records for 1997**

On **January 31, 1997**, Mr. Brennan wrote to Mr. Harbin informing him that Leve had attended only two sessions in January due to her attempts to stretch out her sessions and at times due to transportation problems. Tr. 131. Mr. Brennan noted Leve had experienced some events that initially threatened her stability but she was able to "navigate her way thru crisis in a new manner that has allowed her to remain stable." *Id.* Mr. Brennan also reported Leve was "pleased with her TVI classes.

On **February 28, 1997**, Mr. Brennan wrote to Mr. Harbin informing him that Leve only attended two sessions in February and "seemed to be functioning in her normal range." Tr. 130. Mr. Brennan also requested more sessions for Leve. Mr. Brennan noted Leve was concerned

16

about how she would cope without the support.  Mr. Brennan also reported that Leve liked TVI

and that she had lost her General Assistance and was moving in with her mother.

On **March 30, 1997**, Mr. Brennan wrote to DVR, protesting DVR's refusal to extend

more counseling sessions for Leve.  Tr. 129.  Mr. Bennan also reported Leve had attended two

sessions in March and had been dropped from her TVI classes due to nonattendence.  Mr. Bennan

reported Leve complained of having difficulty sleeping, having problems using public

transportation, and having increased depressive symptoms.  *Id.*  Mr. Bennan pressed for more

counseling session, opining Leve would not do well without them.

On **April 7, 1997**, Mr. Brennan wrote to Mr. Harbin.  Mr. Brennan reported that overall

Leve had taken some very big steps in her treatment with him but "recent events suggest[ed]

some backward movement.  Tr. 128.

### d.  Records for 1998

On **January, 16 1998**, Leve went to UNM-MHC-PES (Psychiatric Evaluation).  The

attending physician noted it was the second night Leve had presented at PES with complaints of

insomnia.  Tr. 194-196.  The attending physician completed a mental status examination, noting

Leve was cooperative, she was adequately dressed and groomed, she was oriented in all spheres,

her mood and affect were anxious, her thought form was organized, memory was adequate, and

insight and judgment were adequate. The attending physician assigned Leve a GAF score of 60

(moderate symptoms).  The physician also instructed her to keep her January 29, 1998

appointment at UNM-MHC Continuing Care Clinic (UNM-MHC-CCC).

On **January 29, 1998**, Leve returned to UNM-MHC-CCC for a follow-up appointment.

Tr. 193.  Leve discussed her last two visits to UNM-MHC-PES.  She reported feeling desperation

and loneliness.  She also reported "anxiety through the roof."  The attending physician described her as "relatively stable."  Her mental status examination indicated she had fair eye contact, restricted and slightly angry mood, the thought process was organized, and her insight and judgment were good.  *Id.*

On **March 19, 1998**, Leve returned to UNM-MHC-CCC complaining of "steady anxiety." Tr. 185-192.  Leve complained she had been seen by a number of residents and requested an attending psychiatrist.  Leve reported her sleep, energy and concentration were adequate, and her appetite had decreased with no weight change.  *Id.*  The nurse assessed Leve's mental status as generally cooperative, was oriented in all spheres, her mood and affect were anxious, her thought form was organized, she denied suicidal ideation, her memory was adequate, attention and concentration were adequate, and her insight and judgment were adequate to meet her needs and utilize the resources available to her.  Tr. 186.  The nurse assigned Leve a GAF of 58 (moderate symptoms).  The nurse scheduled an appointment with a physician.

On **April 2, 1998**, Leve returned to UNM-MHC for her follow-up appointment.  Tr. 184. Leve reported she did not feel the Paxil was working because she had not yet felt stable. However, Leve reported the Trazodone had helped her sleep.  The mental status examination indicated Leve's mood was "high anxiety and depressed" but her affect was noted as "restricted-euthymic (not depressed)."  *Id.*  The physician also noted "increased anxiety, constant, worries about getting SSI, feels lonely, no suicidal ideation."  *Id.*  The physician noted a case conference was scheduled for the following Monday.

On **April 6, 1998**, the UNM-MHC-CCC Case Conference took place.  The physician noted Leve had been receiving services since July of 1994.  Tr. 181-182.  The physician

18

documented over one hundred seventy-three (173) visits to UNM-MHC.  This included twelve

individual psychotherapy sessions and one hundred eleven Day Treatment Program days of

participation, including individual and group therapy.  *Id.*  **The physician questioned the**

**diagnosis, the treatment and noted "Are we helping this patient stay well and out of the**

**hospital, or are we somehow perpetuating the chronicity of her illness, and her inability to**

**work and support herself?"**  Tr. 183.   The physician noted he would refer Leve to "attending

clinic" in six month, change her medication to Serzone, starting at 100 mg twice a day with a goal

of 600 mg a day, decrease her Paxil to 40 mg every day and discontinue Paxil once she was on

Serzone 400 mg.  Tr. 183.

On **May 13, 1998**, Dr. Rene Gonzalez, a psychiatrist and agency consultant, evaluated

Leve.  Tr. 150-153.  Dr. Gonzalez noted Leve had reported that she had been in treatment for the

last 1 ½ years but had not received any individual or family therapy.  Tr. 150.  Dr. Gonzalez noted

the history and stated Leve was "presently continuing to suffer depression and anxiety and it

seems that she is showing improvement with the medication that is prescribed to her."  *Id.*

In her psychosocial history, Dr. Gonzalez noted that Leve reported she had difficulty

learning and was able to relate well to others.  Tr. 151.

The Mental Status Examination indicated Leve was cooperative and related well to Dr.

Gonzalez.  Tr. 151.  She was dressed and groomed appropriately.  Mood appeared to be mild to

moderately depressed.  Affect appeared to be appropriate to her mood.  Thinking form and

progression appeared to be normal.  Content was showing some depressive trends.  Concentration

and attention appeared to be mildly impaired.  Leve was not having suicidal or homicidal ideation.

Leve was not having any hallucinations.  She was alert and oriented to person, place, time and

situation.  Her memory, immediate, recent and remote as well as registration appeared to be intact.  Tr. 152.  She had insight about her problems.  Judgment was normal.  Leve did not have any depersonalization or derealization or any major somatic complaints except for weight gain of fifty pounds in the last two years.

Dr. Gonzalez' provisional diagnoses were: (1) Axis I– Major depression, recurrent episode, marijuana abuse.  Rule out post-traumatic stress disorder; and (2) Axis II– Rule out borderline personality disorder.  Dr. Gonzalez assigned Leve a GAF score of 55 for the present time and 65 for the past year.  A GAF score of 65 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.  DSM-IV-TR at 34.

Dr. Gonzalez concluded:

> Kristin M. Leve is a 28 year-old female who had been suffering from mild to moderate psychiatric problems.  She has been having some somatic complaints. She had gained about 50 pounds in the last two years and she had been having insomnia that is responding well to present medication.  She has never had any DWI and she is able to take care of her basic activities of daily living.  The mental status examination showed that she is in depressed mood, her I.Q. is within normal limits and she is not having any major memory problems.  The patient has been diagnosed with major depression, marijuana [abuse], rule out post-traumatic stress disorder and rule out borderline personality disorder.  The patient is competent to handle her own benefits if they were awarded to her and the patient is able to remember basic instruction.  She mentioned that she relates well to others.  She stated also that she is not able to handle a job because of her mental problems but she stated that if this improves she will be able to handle a job.  It seems that is (sic) the patient gets the necessary assistance and shows memory improvement with her psychiatric problems she may be able to have a structured, simple, routine and nonstressful, low responsibility and a great deal of supervision type of job.

Tr. 152.  Dr. Gonzalez recommended Leve get involved in individual and family therapy, continue to take her medication, continue to see Dr. Feierman to monitor her medication closely, and

20

maintain sobriety.  Tr. 152-153.  Dr. Gonzalez opined Leve's prognosis was good as long as she followed his recommendations.  Tr. 153.

On **May 18, 1998**, Leve presented to UNM-MHC-PES for increasing anxiety.  Tr. 176. Leve requested she be hospitalized.  However, Leve denied having suicidal feelings but reported being afraid someone would hurt her mother.  *Id.*  A Narrative Form from UNM-MHC indicates Leve reported she had a disagreement with her mother and was feeling down and disappointed. Tr. 177.  Leve reported to the physician that she had been to an SSI evaluation and expected to be turned down.  The physician noted Leve's mood as "down" and her affect as restricted and congruent.  The physician recommended the Partial Hospitalization Program.  The physician also informed Leve that she would continue her outpatient care in July.

On **May 20, 1998**, Dr. Donal K. Gucker, a psychologist and a non-examining agency consultant, completed a Psychiatric Review Technique (PRT) form.  Tr. 154.  Dr. Gucker evaluated Leve under Listings 12.04, 12.06, and 12.09.  Tr. 154.  Dr. Gucker rated these impairments in terms of severity and found Leve had a *slight degree* of limitation in the areas of activities of daily living and in maintaining social functioning, *seldom* had deficiencies of concentration, persistence or pace, and had *insufficient evidence* to determine whether Leve had episodes of deterioration or decompensation in work or work-like settings.  Tr. 161.  In support of his findings, Dr. Gucker considered several factors including her 1996 vocational evaluation, Dr. Gonzales evaluation, and her 1997 vocational evaluation.  Tr. 155, 163.  Dr. Gucker opined Leve retained the RFC for unskilled significant gainful activity.  Tr. 163.

Dr. Gucker also completed a Mental Residual Functional Capacity Assessment form and found Leve was *moderately limited* in the ability to understand and remember detailed

21

instructions, *moderately limited* in the ability to carry out detailed instructions, *moderately limited* in the ability to sustain an ordinary routine without special supervision, and *moderately limited* in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Tr. 164-167.

From **May 28 to July 10, 1998**, Leve participated in the Partial Hospitalization Program.  Tr. 171-172.  Leve was admitted to the program to help alleviate her depressive symptoms and to increase her coping skills.  Tr. 171.

On **June 29, 1998**, a Narrative Form indicates Leve was evaluated at UNM-MHC.  Tr. 175.  Leve reported she was attending the Partial Hospitalization Program and felt the program was helping her.  Leve also reported she had been denied SSI but planned to follow-up with a lawyer.  Leve informed the physician she was not happy with Serzone because it made her feel "blah, low energy" and did not feel it helped her control her emotions like Paxil did.  Because Leve was going to continue her treatment with a new physician, the physician did not change her medication.  The physician reported Leve's mood as "kind of jittery," her affect as slightly restricted, her thought processes as linear and organized and her insight and judgment as appropriate.  The physician noted Leve had an appointment with Dr. Fraser on July 14, 1998.

On **July 9, 1998**, Leve's treatment team met to discuss her case.  Tr. 174.  The Multidisciplinary Plan Review indicates Leve suffered from Major Depressive Disorder and Borderline Personality Disorder.  The team considered Leve's opinion that she felt better on Paxil.  Nonetheless, the team opted to increase her Serzone dosage and declined to change her medication.  The team assigned Leve a GAF score of 58 (moderate symptoms).  The team noted hormonal tests had been ordered.

On **July 10, 1998**, Leve was discharged from the Partial Hospitalization Program.  Tr. 171-173.  The discharge summary indicates Leve's discharge diagnoses were Major Depressive Disorder, recurrent; dysthymia, and Borderline Personality Disorder.  Under Axis IV, the attending physician listed poor coping skills, unemployed, and seeking benefits.  The attending physician assigned Leve a GAF score of 45 (serious symptoms).

According to the attending physician, Leve was hospitalized for increasing depression and to help alleviate her depressive symptoms and increase her coping skills.  Leve reported decreased energy, increased derealization, increased sadness, poor sleep, and being stressed over having her belongings in Arizona sold due to her mother's failure to pay the monthly storage fee.  Tr. 171.

During her hospitalization, Leve reported a low mood, decreased energy, poor sleep and poor concentration.  Leve attended and participated in group therapy.  At the time of discharge, the physician noted Leve's affect "brightened" and she had plans for after discharge, including continuing to pursue Social Security benefits, a driver's license, and admission into DVR.  Leve also planned to eventually move out of her mother's house.  Tr. 172.  Although Leve was taking 300 mg of Serzone twice a day while hospitalized (Tr.171), by the time of discharge, Leve reported taking only 300 mg of Serzone at night, eliminating the morning dose on her own. Tr. 172.  Leve reported to the physician that this dose was effective for her and she felt more alert.  Leve also expressed her desire to try Zoloft once she began therapy with Dr. Fraser as an outpatient.  The attending physician scheduled appointments for Tuesday, July 14, 1998 with Ann Gardner, MHC Psychotherapy Clinic on Fridays from 9:30 a.m. to 11:00 a.m., and Depression Group on Tuesday, July 14, 1998 at 9:00 a.m.

On **July 14, 1998**, Leve was evaluated at UNM-MHC.  The physician's Narrative Form indicates she participated in the Partial Hospitalization Program until July 10, 1988, when the program ended.  Tr. 169.  Leve reported the program was very helpful.  Leve indicated her after care plan included individual and group therapy, volunteer work and seeing friends occasionally.  At this time, Leve was living with her mother.  Leve complained Serzone, an antidepressant, was only partially helpful because she had not been able to increase her dose beyond 300 mg due to the side effects she experienced.  Leve also reported Doxepin (used for the treatment of depression and/or anxiety) had not been effective, Desipramine was questionably helpful, and Paxil initially had been helpful but after two years it had no longer helped her.  However, Leve reported Trazodone helped her insomnia.

The physician noted Leve was neatly dressed and groomed, her affect was reactive, her thought process was coherent and there was no evidence of suicide ideation or psychosis.  *Id.* The physician diagnosed Leve with Major Depression, partially remitted and Borderline Personality Disorder by history.  Tr. 170.  The physician directed Leve to taper off Serzone by 50 mg every 4 days and prescribed Zoloft 50 mg for two weeks then 100 mg every day.  Leve was to continue with her outpatient therapy and return for a follow-up in one month.

On **August 5, 1998,** Leve completed a Daily Activities Questionnaire (Adult).  Tr. 111.  On a typical day, Leve reported watching television all day, from 11:00 a.m. to 11:00 p.m.  Tr. 111, 114.  Leve also reported she left her home only for appointments and "maybe once a month to socialize with friends, depend[ing] on how she [felt]."  *Id.*  Leve reported it was hard for her to "get out of the house due to anxiety and lack of motivation."  *Id.*  Leve reported going shopping once a week and watching movies two 2-3 times a month.  Tr. 113.  Leve reported "low interest

and low motivation" kept her from participating in recreational activities.  Tr. 114.  Leve reported her social contacts included talking with her friends on the telephone for anywhere from ten minutes to one hour and visiting with friends once a month.  Tr. 115.  Under  "Personal Information," Leve noted that she got along well with people "mostly fine."  Tr. 116.

On **August 13, 1998**, Dr. Lisa Feierman wrote a "To Whom It May Concern" letter, stating she had treated Leve from January 1998 to July 1998.  Tr. 219.  Dr. Feierman stated, "I believe that her mental illness prevents her from working full time and supporting herself at this time.  Any financial assistance that can be offerred (sic) would me helpful."  *Id.*

On **August 13, 1998**, Dr. Marvin G. Scherr, a psychologist and agency consultant, completed a  Mental Residual Functional Capacity Assessment form.  Tr. 205-207.  Dr. Scherr opined that Leve was only *moderately limited* in her ability to maintain attention and concentration for extended periods and in her ability to respond appropriately to changes in the work setting.  Tr. 205.  Dr. Scherr found Leve was able to understand and remember instructions with *minimal limitations*, able to maintain concentration and pace with *minimal limitations*, able to relate appropriately with others with *minimal limitations*, and was able to adapt to routine changes is a job setting with *minimal limitations*.  Tr. 207.  Dr. Scherr also completed a Psychiatric Review Technique form.  Tr. 209.  Dr. Scherr conclude Leve's mental impairments were severe but did not meet or equal Listings 12.04, 12.08, or 1209.  Tr. 210.  Dr. Scherr documented the evidence he relied upon to reach this conclusion and noted Leve's mental impairment was recorded as moderate on September 30, 1997.  *Id.*

On **August 14, 1998**, Jack Osborne, a DVR counselor, interviewed Leve.  Tr. 408.  At that time, Leve reported she was applying for General Assistance and was receiving food stamps.

25

Leve informed Mr. Osborne that her SSI appeal was in process.  Mr. Osborne opined Leve could benefit from vocational rehabilitation services but needed further evaluation.

On **August 25, 1998**, Dr. Kathryn Fraser wrote a "To Whom It May Concern" letter at Leve's request.  Tr. 218.  Dr. Fraser wrote Leve had been treated in the outpatient department of the Mental Center since July 1994 with various medications that had been partially effective, and she had benefitted from the partial hospitalization program and would continue in psychotherapy. Dr. Fraser stated "As far as I am aware, she has not worked in gainful employment for the last three or four years due to her depression and personality disorder.  It has been difficult for her to accept that she may not be able to find work that she finds rewarding and meaningful at this time." *Id.*  Dr. Fraser also reported that medications and therapy would help her to some extent, and DVR had been recommended to help her find suitable part-time employment as she continued with treatment.  At this time, Leve was seeing Dr. Fraser once a month, her therapist weekly, and she was participating in a post partial hospital group.

On **September 21, 1998**, Mr. Osborne placed Leve in "Extended Evaluation" due to Leve's "lack of follow through Hx (history)."   Tr. 408.

On **November 2, 1998**, Mr. Osborne interviewed Leve once more.  Tr. 409.  Leve reported she and her mother had moved into a new apartment, and she was feeling better.  Leve expressed her desire to become a journalist.  Mr. Osborne advised Leve to start with six credit hours at TVI for the spring semester and then increase up to twelve hours if she thought she could handle it.  Mr. Osborne set August 2001 as the anticipated completion date for a Liberal Arts Degree and informed Leve that DVR would pay for tuition, fees, books, supplies and a bus pass. In return, Leve was to continue her therapy at UNM-MHC, take her medications, maintain a 2.0

26

GPA and not withdraw from her classes.  Mr. Osborne advised Leve she could continue at UNM if she wanted to pursue a BA, but he was still evaluating her to see if she could complete a semester successfully.

On **November 3, 1998**, Mr. Osborne completed an Individualized Written Rehabilitation Program.  Tr. 413.  He determined that an extended evaluation was necessary "because it [was] uncertain that [Leve] could benefit from vocational rehabilitation services in terms of an employment outcome."  *Id.*  Mr. Osborne based his determination on Leve's inability to follow through.  Leve participated in her program and wrote under Client Views and Participation: "I am excited to start school and hope to eventually work my way up to being a full time student on work study.  Once I get my associates at T.V.I. I plan to transfer to UNM to get my degree in journalism."  Tr. 414.

On **November 23, 1998**, Leve called to cancel her appointment with Mr. Osborne because she was ill.  Tr. 409.

On **November 30, 1998**, Dr. McCarty noted Leve was thirty minutes late for her appointment.  Tr. 233.  Leve reported Zoloft was working well.  Leve also reported she was starting TVI in January.  Leve informed Dr. McCarty she was working through DVR in the mental health office.  Leve also reported she had been sick for the past three months with bronchitis, ear infections, and a toothache.  Significantly, Leve reported she was more stable since she moved and was pleased with her new place.  Dr. McCarty noted Leve was doing well overall and was pleased with Zoloft.

On **December 2, 1998,** Leve met with Mr. Osborne.  Tr. 409.  Leve stated that with DVR's help she was getting things in place on time and was not becoming stressed out.

However, Leve reported she was at TVI obtaining forms and information and became exhausted and had to leave.  Leve requested a computer for writing papers and doing research because she could not stay out for long periods without getting exhausted.  Mr. Osborne offered to look into a loaner program and advised Leve that she would have to successfully complete a semester before DVR would consider purchasing a computer for her.

On **December 12, 1998**, Leve's treatment team at UNM-MHC met.  Tr. 232.  The Multidisciplinary Treatment Plan Review indicates Leve continued to require continuous treatment to control symptoms and to maintain her stabilization.  The review indicates Leve reported she was still depressed but doing better with her current medications.  Leve reported she was sleeping better and her appetite was "steady" for over a year.  The team noted Leve had been denied SSI and her work history for the last four years had been sporadic therefore her motivation was low.  At this time, Leve was seeing a psychiatrist every month and a therapist weekly.  However, the team noted Leve was "not consistent in seeing them or late in coming to her appointments."  *Id.*

**e.  Records for 1999**

On **January 4, 1999,** Leve called Mr. Osborne, requesting funds for books and supplies.  Tr. 409.  Mr. Osborne authorized $119.00 for books and a mini cassette player.

On **January 25, 1999**, Leve called Mr. Osborne to report she was doing well.  Tr. 410.  Leve reported she had received a PELL grant in the amount of $1000.00 and would receive the same amount the following semester.  Leve also informed Mr. Osborne she was still trying to get SSI.

On **February 9, 1999,** Leve met with Mr. Osborne.  Tr. 410.  He noted Leve was thirty minutes late for her appointment but was in a very good mood.  Leve reported her classes were going well.  Leve expressed surprise that she was doing well with all the activities and stress of returning to school.  Significantly, Leve informed Mr. Osborne she was only going to therapy twice a week instead of four times a week.

On **February 18, 1999**, Dr. McCarty noted Leve was doing well and was in school part-time.  Tr. 231.  Leve reported cutting back her psychotherapy to every other week and felt her medications were working for her.  Dr. McCarty also noted Leve was not suicidal.  Dr. McCarty diagnosed Leve with Depression in <u>treated remission</u> and noted she still had many relationship issues.  Dr. McCarty instructed Leve to return in three months.

On **February 22, 1999**, Leve received therapy at UNM-MHC.  Tr. 265.  Leve reported school was going well and was getting along well with her mother.  The therapist noted "Going well in all areas, nothing to work on at the moment."  *Id.*  The therapist instructed Leve to return in two weeks.

On **April 5, 1999**, Leve returned for her therapy session at UNM-MHC.  Tr. 264.  Leve reported school was almost done for the semester and was worried she was not doing as well as she should.  The therapist noted "belongs to a horse club and rides."  *Id.*  The therapist reported Leve "was able to control the self-defeating thoughts and not let them get her down."  *Id.*  The therapist assessed Leve as having "a positive affect" and "making good decision."  *Id.*  The therapist instructed Leve to return in two weeks.

On **April 8, 1999**, Mr. Osborne met with Leve for a periodic review.  Tr. 410.  He noted Leve arrived on time.  Leve reported she was making progress in school towards her goal of

competing a Liberal Arts degree and had received an A and a B on some tests.  Leve requested a computer, but Mr. Osborne suggested Leve use the computer lab at TVI.  Mr. Osborne and Leve discussed taking two classes in the summer with the possibility of taking three or four classes  in the fall.

Leve informed Mr. Osborne that her SSI application was still on appeal.  Leve also advised him that she was only seeing her psychiatrist every three months and going to therapy only twice a week.  Leve expressed her satisfaction with the medications she was on and stated "this is the best medication has worked since she was diagnosed over 5 years ago with depression."  Tr. 410.  Mr. Osborne advised Leve that he would review her grades on May 15, 1999.

On **April 23, 1999**, the therapist at UNM-MHC noted "does not seem to need counsel[ing] at this time."  Tr. 263.

On **April 23, 1999**, Dr. McCarty noted he had an appointment with Leve for 9:00 a.m. but was delayed at a court hearing and could not make the appointment.  Tr. 263.  Dr. McCarty noted Leve left without being seen which he opined was a very reasonable thing to do.  Dr. McCarty rescheduled Leve's session.

On **May 7, 1999**, Leve called UNM-MHC to cancel her appointment because she missed the bus.  Tr. 262.  However, Leve reported she was doing well.  On the same day, Dr. McCarty called in a prescription for Zoloft and Trazadone.

On **May 12, 1999**, Leve failed to show up for her therapy appointment with her UNM-MHC therapist.  Tr. 261.

30

On **May 13, 1999**, Mr. Osborne noted "Client completed classes, has 4.0 gpa.  Follows through, made progress.  It is believed that she will benefit form (sic) VR services in terms of an employment outcome."  Tr. 410.  On that day, Leve and Mr. Osborne set goals for Leve completing a AA degree in Liberal Arts at TVI.  Mr. Osborne set out the services Leve would receive which included tuition, fees, books, supplies, monthly bus pass, driving lessons, job development coaching, and guidance/counseling.  In return, Leve agreed to continue her mental health program at UNM-MHC by attending her therapy and psychiatric sessions and taking her medications.

On **May 14, 1999**, Leve returned to UNM-MHC for her therapy session.  Tr. 260.  Leve reported "things are kind of OK."  *Id.*  Leve informed the therapist she would start school on Monday and would start driving classes in July.  The therapist noted Leve was working on anxieties and was learning how to change perspectives and engage in reality testing.  The therapist assessed Leve as "doing well."  *Id.*

On **June 8, 1999**, Leve failed to show up for her scheduled appointment with Dr. McCarty.  Tr. 260.  Dr. McCarty noted he had called Leve.  According to Dr. McCarty, Leve explained she had forgotten about the appointment.  Dr. McCarty scheduled Leve for his next available appointment for that day.

Dr. McCarty saw Leve three hours later and noted she explained she had not received a reminder call and therefore forgot about her appointment.  Dr. McCarty noted Leve's affect was reactive, her mood was "pretty good," and her thoughts were linear.  *Id.*  Significantly, Leve reported she had not had suicide ideation "in an incredibly long time."  *Id.*

Dr. McCarty assessed Leve as "**Depression– treated**."   Besides this notation, Dr. McCarty wrote "I love Zoloft!"   Dr. McCarty instructed Leve to return in three months and continue psychotherapy.

On **June 29, 1999**, Leve did not show up for her scheduled therapy appointment with her UNM-MHC therapist.  Tr. 258.

On **June 12, 1999**, Leve called to cancel her therapy appointment with her UNM-MHC therapist and rescheduled for June 15, 1999.  Tr. 257.

On **June 15, 1999**, Leve called to cancel her therapy appointment with her UNM-MHC therapist.  Tr. 256.

**f.  Records for 2000**

On **February 2, 2000,** Leve returned to UNM-MHC-CCC for medicine management and an evaluation.  Tr. 496.  Leve reported she had not been doing well for the past month and was having money problems since her mother lost one of her jobs.  Leve stated she had been turned down for social security disability for a third time.  Leve told Dr. Rendall the judge had found her not credible and found she could work as a maid.  Leve reported her lawyer was handling her case.  Leve also informed Dr. Rendall she had stopped going to TVI and was not babysitting.  Leve complained of dental problems and a sore throat.

Dr. Rendall noted the following: Leve had good eye contact, was oriented, her speech was organized, she was sleeping eight to nine hours at night, her appetite was fine, energy level was "not good," concentration was "less," short term memory was poor, mood was bad but not as bad as in the past, she had no suicidal thoughts, she had three to four anxiety attacks in the past month, and she was not psychotic.  Tr. 496.  Dr. Rendall encouraged Leve to get medical

attention for her physical complaints.  Dr. Rendall prescribed Benadryl at bedtime and continued her on the Zoloft.

On **February 9, 2000**, the treatment team met to review Leve's case.  Tr. 495.  The Multidisciplinary Treatment Plan Review indicates the team opined Leve required continued monitoring and medication to maintain "therapeutic stability."  The team noted Leve was faced with increased stressors, money problems and health issues.  The team recommended Leve see a primary care physician for her medical problems and continued her on Zoloft but increased the dosage.  The therapist instructed Leve to return in two months.

On **March 8, 2000**, Leve returned to UNM-MHC-CCC for medicine management and an evaluation.  Tr. 494.  Leve reported she was about 50-60 % improved on the increased dose of Zoloft and was "not as sad, desperate or despairing" and her mood was stable.  *Id.*  Leve told Dr. Rendall her mother had received a promotion and a raise so financially there were less problems. Leve also told Dr. Rendall she was appealing the denial of her social security benefits.  Leve informed Dr. Rendall she was working on getting her driver's license and was working with DVR on job retraining and "perhaps a part-time job."  *Id.*  Leve stated she had a party on her birthday and her friend had given her dinner.

Dr. Rendall performed a mental status examination and found as follows: clean, casually dressed, oriented, friendly, good eye contact, looks cheerful, speech is linear and organized, sleeping eight to nine hours per night, appetite is fine, weight 192 pounds, energy reported as "don't want to do much," attention/concentration/memory are related to stress level, mood is stable and not depressed, denies crying, suicidal ideation, homicidal ideation, and violent ideas, is less anxious, insight and judgment are unimpaired, and is not psychotic.  Dr. Rendall diagnosed

Leve with Major Depressive Disorder, recurrent but about 60% improved on current medications.
Dr. Rendall noted Leve had an appointment with a primary care physician on March 29, 2000.
Dr. Rendall instructed Leve to continue on her medications.

On **April 12, 2000**, Leve called Dr. Rendall at UNM-MHC-CCC for a prescription refill,
stating she had lost the prescription.  Tr. 494.  Dr. Rendall called in her prescription for Zoloft
and Benadryl to the UNM Pharmacy.  Leve's next appointment was scheduled for May 10, 2000.

On **May 10, 2000**, Leve returned to UNM-MHC-CCC for her medicine management and
evaluation with Dr. Rendall.  Tr. 493.  Leve reported her insomnia was "real bad."  Dr. Rendall
listed the litany of Leve's complaints as follows: stated she wasn't sure her mother got a raise,
they were having plumbing problems, she had not gone to DVR, she had not obtained her driver's
license, her social security outcome was still pending, her mother had never validated her,
pathological lying (it is not clear whether Leve is referring to her mother or to her own behavior),
and she was stressed by her pending colposcopy because she feared she would never have
children.  *Id.*

Dr. Rendall performed a mental status examination and noted the following: good eye
contact, oriented, speech logical and organized, sleeping about five hours a night and restless,
poor appetite (not eating much), weight 190 pounds, energy level low, mood-sad "but not in the
desperate pit of depression," not suicidal, or homicidal, or violent, affect was full range and
appropriate, denied panic attacks, insight and judgment are good, and not psychotic.  *Id.*  Dr.
Rendall diagnosed Leve with Major Depressive Disorder "improving on medication in spite of
many stressors– Possible Dysthymic disorder rather than MDD."  *Id.*  Dr. Rendall instructed Leve
to stay on Zoloft but changed the Benadryl to Vistaril for her insomnia.

34

On **July 19, 2000**, Leve returned to UNM-MHC-CCC.  Leve had an appointment with Dr. Randall for an evaluation and for medication management.  Tr. 492.  Dr. Randell's notes indicate that Leve arrived ten minutes late.  Dr. Randell assessed Leve as having Dysthymic Disorder.  Leve reported DVR had given her a target date of August for her to get her driver's license.  Leve also complained that she was feeling "really overwhelmed lately."  *Id.*  Leve reported she and her mother had been evicted from their home and had to move in with her mother's friend in Rio Rancho.  Leve reported her colposcopy indicated Stage III precancerous cells but, in spite of all the stress, she felt she was doing well on Zoloft.

Dr. Randell performed a mental status examination and noted the following: speech logical and organized, sleep-restless, appetite fine, weight 190 pounds, energy level ("enough energy to organize when moving to new home"), mood– "not suicidal, stable," affect– full range and appropriate, insight and judgment are good, anxiety ++, non-psychotic.  Tr. 492.  Dr. Randell changed Leve's diagnosis from MDD (Major Depressive Disorder) to Dysthymic Disorder and noted Leve was doing fairly well in spite of stressors.  Dr. Randell prescribed Buspar 5 mg three times a day for her anxiety.

On **July 26, 2000**, the Multidisciplinary Team met to review Leve's case.  Tr. 491.  The team recommended Leve continue on her medications and keep her appointments with Dr. Rendall.  A follow-up visit was scheduled for two months.

On **August 21, 2000**, Leve returned for her medicine management and evaluation with Dr. Rendall.  Tr. 489.  Leve stated she had "been in crisis mode lately."  *Id.*  She reported she was still stressed over the move to Rio Rancho, she still did not have her driver's license, she had an appointment with her counselor (Mr. Osborne) at DVR, Mr. Hartshorne was doing a lifestyle

assessment that afternoon, she had not been taking the Buspar as directed, and she would be contacting ILRC (Independent Living Resource Center).

Dr. Rendall performed a mental status examination and noted as follows: good eye contact, speech linear and organized, sleeping anywhere from 6 to 12 hours a night, appetite unchanged, weight the same, energy level low ("feels drugged"), mood– "lots of depression" "not reached the point of suicide" "haven't needed to come to crisis center; " affect– full range and appropriate, no psychomotor retardation, insight and judgment are good, and anxiety still present. Dr. Rendall diagnosed Leve with Dysthymia and opined she was doing well in spite of stressors. Dr. Rendall discontinued the Buspar because she was starting psychotherapy and felt she did not need to be too medicated.

On **September 6, 2000**, Jonathan Hartshorne, a licensed counselor with Life Skills Counseling, reported meeting with Leve regularly throughout August, 2000 to complete an initial extensive assessment. Tr. 423. All of Mr. Hartshorne's reports are addressed to Jack Osborne, Leve's DVR counselor. Mr. Hartshorne described Leve as a "veteran of years of therapy" who could discuss herself intelligently, who was capable of insights and who understood her diagnoses but had difficulty seeing herself as anything other than a "mental patient." *Id.* Notably, Mr. Hartshorne opined, "So far, looking at the history, it is hard to identify what would account for such a large package of diagnoses. She has some very favorable factors in her history, and though she is not without her hard times and unfavorable factors, I still find myself scratching my head as to why she is as incapacitated as she appears to be, or get." *Id.*

On **September 18, 2000**, Dr. Rendall evaluated Leve. Tr. 488. Leve reported the following new stressors: her cat had disappeared, one of her friends had committed suicide, her

36

mother's friend with whom they lived wanted "to get her out," she had a laser procedure for a problem with her cervix done on September 12, and she had lost her privileges at UNM-MHC because she moved to Rio Rancho.  Dr. Rendall diagnosed Leve as suffering from dysthymia.

Dr. Rendall performed a mental status examination and noted: oriented, good eye contact, attention/concentration/memory are fair, speech organized and logical, sleep "not too great," appetite was reported to be fine, weight 182 pounds, energy level reported to be low, mood was depressed, affect was constricted, insight and judgment were good, and she was not suicidal or psychotic.  Dr. Rendall prescribed Ativan for her anxiety and scheduled a follow-up appointment as requested by Leve.

On **October 11, 2000**, Mr. Hartshorne completed his assessment of Leve.  Tr. 436.  Mr. Hartshorne opined Leve was in an extended grief reaction due to all the deaths she had experienced in her life.  Mr. Hartshorne also found Leve to be a connector, a person who attached easily and well to people, making her losses even greater.  According to Mr. Hartshorne, Leve had not been in touch with the parts of her which had become passive and dependent.  With this counseling session, Mr. Hartshorne noted he had discussed this aspect of Leve's personality and was pleased "how clearly she did see them when she looked, for their rehabilitation [would] be the key to her creating independent viability."  *Id.*  However, Mr. Hartshorne also found that as he spend more time with Leve, he realized she had "some very entrenched passivity and discouragement which had grown stronger with each loss."  *Id.*  Specifically, Mr. Hartshorne was referring to Leve's failure to follow through on one objective set at their previous therapy session.  Mr. Hartshorne described this objective as "the first action step in our work."  *Id.*  Leve had agreed to gather information regarding how to transfer her McGinnis driving class to Rio Rancho.

Mr Hartshorne opined that her entrenched passivity and discouragement were "the primary obstacles to her rehabilitation."

On **October 18, 2000**, Leve failed to show up for her appointment with Dr. Rendall.  Tr. 488.  Dr. Rendall noted Leve had failed to call to cancel.  Dr. Rendall called Leve's home and spoke to her brother and left a message asking her to reschedule.

On **November 2, 2000**, Mr. Hartshorne's report to Mr. Osborne indicated that Leve had identified a goal for her psychotherapy with Mr. Hartshorne as "build coping skills."  Tr. 437.  Mr. Hartshorne felt this was an excellent goal and agreed to focus on this.  Mr. Osborne identified the main coping skill he wanted to teach Leve as "teaching her how to pull herself out of the depressed hopeless place she gets stuck in."  *Id.*  He reported making good progress on this goal in the last two sessions and opined Leve would be able to do this competently.  Because Leve was complaining of a sinus infection, Mr. Hartshorne referred her to Rio Rancho Family Health.

On **November 18, 2000**, Leve, accompanied by her mother, went to UNM-MHC-PES.  Tr. 501.  Leve reported being off her Zoloft for one month because of lack of funds and due to her UNM card expiring in October when she moved to Rio Rancho.  Leve complained of menstrual pain, a toothache, and of feeling suicidal.  The nurse noted Leve was a DVR client who was applying for SSI, and that Independent Living Center was looking for housing for her.  The nurse assessed Leve as being lethargic but cooperative, really depressed with a flat affect, her thought form was organized and linear, she had suicide ideation and angry "lashing out" ideation, and her insight and judgment were fair to poor.  Leve stated she would hurt herself by overdosing or slitting her wrists if she was not admitted to the hospital.  She was admitted to the psychiatric ward.

Dr. Ardis Martin completed a History and Physical.  Tr. 503-508.  Dr. Martin noted Leve had reported having increased depressive symptoms after discontinuing her Zoloft for one month. Tr. 503-508.  Leve reported she had been on Zoloft which was effective but had been off Zoloft for one month secondary to inability to pay.  Leve reported she had not "felt this bad in so long and doesn't want to go back to where she was, where everyone had to take care of her and make her decisions for her."  Tr. 503.  Leve threatened "if you don't admit me then I'm going to go out and do something to myself that people won't like."  *Id.*  Leve threatened to overdose on pills, jump off a bridge, or slit her wrists.  Leve described the following recent stressors: not having a place to stay, unable to get disability, her cat had recently died, a close friend committed suicide in August, and having difficulty with the fact that she was unable to work or go to school secondary to her illness.

In her social history, Leve denied any physical or sexual abuse.  Tr. 504.  Leve reported her mother was an alcoholic.  Leve reported being married once but had no children.  Leve stated she was not working but had "attempted 3 times to get Social Security benefits and is now working with a lawyer to go after those benefits for the fourth time."  *Id.*  Dr. Martin noted Leve made it a point to say that the only thing she had been able to accomplish over the past thirteen years was to get her GED in 1997.

Dr. Martin performed a mental status examination.  Tr. 506.  Dr. Martin found the following:  fair grooming and hygiene; slightly psychomotor retarded; very cooperative ("The patient is very cooperative but also does become upset when questioned about her need to be in the hospital, becomes somewhat threatening in her behavior."); poor to fair eye contact, speech soft and low at times ("but when challenged the patient does begin to have an increase in her

volume and tone"); mood– depressed; affect– labile ("The patient crying on occasion, on another occasion the patient stops and threatens that if she doesn't get admitted to the hospital she'll do something that people will not be happy with, and then when she finds out that she is allowed to be in the hospital the patient's affect becomes less dysphoric."); thought process– linear and organized; thought content– no auditory or visual hallucinations; suicidal; vegetative symptoms; and fair to poor insight and judgment.  Dr. Martin found Leve was oriented, her memory was intact, her attention was intact, and her general knowledge was average.

Dr. Martin performed a physical examination which was essentially normal and noted "patient in no apparent distress."  Tr. 507.  Dr. Martin's impression was that Leve had been previously stabilized on Zoloft despite stressors but had been off the medication for approximately one month.  Dr. Martin noted Leve had been unable to be motivated to get back on her medications or follow up with Rio Rancho for counseling.  Dr. Martin opined that it was best to hospitalize Leve "to get her started back on her medication and help case management with getting her situated with housing, as well as possibly getting her hooked into the system in Rio Rancho unless she again is in the Albuquerque area where she would probably benefit from PSR and IOP."  Tr. 507-508.  Dr. Martin diagnosed Leve with Depression NOS (not otherwise specified), Rule out Major Depressive Disorder, Rule out Dysthymia.  Dr. Martin's treatment plan included restarting Zoloft, assisting Leve with getting assistance at Rio Rancho or in Albuquerque, and helping her with housing.  Tr. 508.

On **November 22, 2000**, Dr. Carol Fryer, Leve's attending physician during her hospitalization, discharged Leve with a diagnosis of Dysthymia.  TDr. 497.  Dr. Fryer listed Leve's Axis IV (Psychosocial and Environmental Problems) Diagnosis as problems with housing,

employment, financial, and primary support.  Dr. Fryer assigned Leve a GAF score of 45 at

discharge.  Dr. Fryer noted she had placed Leve back on her medication and Leve's suicidality

resolved.  Leve reported being very glad to be back on her medications.  Dr. Fryer noted "one of

the big concerns for her again was her Disability although she recognized this would take time to

resolve.  It was her lack of having access to her medications, which had helped her for some

length of time."  Tr. 498.  With help from UNM Social Work, Leve set up and appointment for

health care in Rio Rancho.  At the time of discharge, Dr. Fryer noted Leve's suicidality had

resolved and Leve was feeling much better.  Leve was given appointments with Buena Vita for

her case management, Rio Rancho Family Health for financial counseling, and scheduled to see

Dr. May on December 6, 2000.

On **December 1, 2000**, Nancy Gagne, a licensed therapist with Rio Rancho Family Health

Center (RRFHC), completed a Mental Health Assessment.  Tr. 485-487.  Ms. Gagne took an

extensive history, listed Leve's medications, and noted Leve was fighting for social security

benefits.  Ms. Gagne completed a mental status examination.  Ms. Gagne found Leve's

appearance appropriate, her motor activity and speech normal, she was oriented in all four

spheres, memory was intact, mood euthymic, affect was broad, thought content was

unremarkable, thought process was organized and rational, and judgment and insight were fair.

Tr. 487.  Ms. Gagne assigned Leve a GAF score of 45 (serious symptoms).  *Id.*

On **December 6, 2000**, Mr. Hartshorne reported Leve had been discharged from her "self-

hospitalization" and had emerged "apparently stronger and more motivated."  Tr. 438.  Mr.

Hartshorne opined Leve's decision to be hospitalized was a good one.  Mr. Hartshorne informed

Mr. Osborne that Leve had been working on building her Adult ego-state and lessening the

influence of her child ego-state, and she had made significant progress.  Mr. Hartshorne noted

Leve had accessed Rio Rancho Family Health and was also looking for a new place to live in

Albuquerque.

On **December 13, 2000**, Leve did not show up for her therapy appointment with Kylee

Shurter, the counselor at RRFHC.  Tr. 483.  Ms. Shurter noted Leve was not high risk and would

wait for her to call to reschedule the appointment.

## g.  Records for 2001

On **January 3, 2001**, Dr. Barbara May completed an Initial Psychiatric Diagnostic

Interview Report.  Tr. 481.  Leve reported she had been receiving mental health services at UNM-

MHC before moving to Rio Ranch with her mother.  She informed Dr. May that she had been

hospitalized in 2000 after being off her medications for 1 ½ months but was doing better on her

medications.  Dr. May noted Leve was casually and appropriately dressed, her motor activity was

normal, her speech pattern was normal, her behavior and attitude were appropriate, her thoughts

were logical, her affect and mood were full range, and her insight and judgment were adequate.

Tr. 482.  Dr. May noted Leve had negative thought patterns, suffered from insomnia and her

memory and concentration were poor.  Dr. May noted Leve had no psychotic symptoms.  Dr.

May instructed Leve to continue with her current medication which would be paid with indigent

funds.

On that same day, Ms. Shurter noted that Leve was supposed to meet with her before

meeting with Dr. May.  Tr. 480.  Ms. Shurter opined that because Leve was already receiving

therapy and Dr. May had given her five refills on her medication, she suspected Leve would not

reschedule her appointment.

On **January 10, 2001**, Mr. Hartshorne reported Leve was doing very well with her medications maintaining her in an adult ego-state and a functional mood.  Tr. 435.  Mr. Hartshorne and Leve had discussed goals for her psychotherapy "given her new stability and the improvement in maintaining her adult ego-state that she [had] made."  *Id.*  Leve's goal was to address FEAR.  According to Mr. Hartshorne, Leve felt this was what stopped her from moving forward.  Mr. Hartshorne reported using EMDR (Eye Movement Desensitization & Reprogramming) to help her release the fear.

On **January 16, 2001,** Leve met with Ms. Shurter for the first time.  Tr. 478.  Ms. Shurter recorded that Leve "talked easily and openly" and noted her mood was up.  Because Leve was happy with the therapy she was receiving from Jonathan Hartshorne, Ms. Shurter recommended Leve come in once a month.

On **January 31, 2001**, Dr. May noted Leve was sleeping better and her depression had improved.  Tr. 476.  Dr. May directed Leve to continue with her medications and return in three weeks.

On **February 7, 2001**, Mr. Hartshorne reported Leve was "in a stronger psychological position than several months ago, partly from Zoloft and partly from our work."  Tr 434.  Mr. Hartshorne also noted "However, the internal resistance to movement is still powerfully entrenched."  *Id.*  According to Mr. Hartshorne, Leve exhibited resistance to becoming independent by being forgetful, being distracted and by losing focus.

On **February 12, 2001**, Leve canceled her appointment with Ms. Shurter.

On **February 21, 2001**, Leve met with Dr. May.  Tr. 473.  Dr. May noted Leve was twenty minutes late.  Leve reported she was having trouble sleeping but was not taking her

43

medication regularly.  Dr. May assessed Leve as "somewhat disorganized" and "erratic compliance."  *Id*.  Dr. May increased Leve's Zoloft to 100 mg and then to 200 mg after two weeks.

On **February 27, 2001**, Leve met with Ms. Shurter to formulate a treatment plan.  Tr. 472.  The plan called for continued weekly therapy with Mr. Hartshorne, meeting with Ms. Shurter monthly to review Leve's progress and her medications, and meeting with Dr. May monthly for medication management.  The projected end date for Leve's care was April 16, 2001.

Ms. Shurter noted Leve had been doing well since her medication was increased.  Leve reported being frustrated with DVR, the agency paying for her therapy with Mr. Hartshorne. Leve also reported she was waiting to hear about her social security benefits.  Leve expressed her desire to continue therapy with RRFHC if DVR discontinued her therapy with Mr. Hartshorne.

On **March 7, 2001**, Mr. Hartshorne's report to Jack Osborne indicated he had raised the issue of work readiness with Leve.  Tr. 433.  Mr. Hartshorne had raised the issue of Leve's lack of transportation since she was living in Rio Rancho and wanted a job in Albuquerque. Additionally, Mr. Hartshorne raised the issue of Leve's unstable housing situation.  Mr. Hartshorne opined Leve was "experiencing strong internal resistance to changing her longstanding pattern of dependence."  *Id.*  According to Mr. Hartshorne, this was reflected by her tendency to forget what they were working on and having difficulty coming up with an agenda for therapy. Mr. Hartshorne had recommended a break until Leve was "truly work ready."  *Id.*   Mr. Hartshorne suggested that when Leve was ready then DVR could provide counseling to assist Leve in an actual job search.  Mr. Hartshorne instructed Leve to call him the week of February 12 to let him know her thoughts on this and to set up an appointment.  Leve never called.  Mr.

Hartshorne surmised the last session had been hard for Leve and his approach "tough."   Mr.

Hartshorne suggested Mr. Osborne check on Leve.

On **March 20, 2001**, Leve failed to keep her appointment with Dr. Harris L. Smith with

RRFHC.  Tr. 470.

On **March 27, 2001**, Leve called Ms. Shurter to reschedule her appointment.  Tr. 469.

Ms. Shurter rescheduled Leve to meet with her on April 9 and with Dr. Smith on April 5.

On **April 5, 2001**, Leve met with Dr. Smith.  Tr. 468.  Dr. Smith was responsible for

managing Leve's medications.  Dr. Smith noted Leve was seen by Dr. May for medication

management in March.  Leve reported being stressed by her legal battle for social security

benefits.  Leve reported her sessions with Mr. Hartshorne would end and she would start

receiving therapy at RRFHC with Ms. Shurter.  Dr. Smith assessed Leve as stable and instructed

her to return in two months.

On **April 10, 2001**, Ms. Shurter reported Leve's mood was up.  Tr. 467.  Leve reported

feeling stable on medications and being optimistic about working with DVR to become

independent and find work she could do.  Leve discussed moving into an apartment near campus

in the next two months and reported she was seeing Mr. Hartshorne weekly since DVR approved

eight more sessions.

On the same day, Leve met with Cary Thomas, her case manager, to apply for financial

assistance to pay for her medications and for food stamps.  Tr. 465-466.

On **May 1, 2001**, Leve met with Ms. Shurter.  Tr. 464.  Leve complained of feeling tired

and spacey due to dealing with an alcoholic friend.  However, Leve reported she continued to

"feel stable for the most part." *Id.* Leve informed Ms. Shurter that she continued to receive therapy form Mr. Hartshorne through DVR.

On **May 9, 2001**, Mr. Hartshorne's report to Mr. Osborne indicates he had counseled Leve twice since he last conferred with Mr. Osborne. Tr. 432. Mr. Hartshorne reported Leve was maintaining her adult ego-state. He also reported Leve was consistently late to her appointments but worked hard during the time that she was there. Mr. Hartshorne opined Leve "would have little difficulty getting a customer service job" based on the jobs skills Leve listed for him, i.e., operating a cash register, computer, experience doing inventory, telephone skills, schematics, managing and people skills. *Id.* However, Mr. Hartshorne added "there is still a block to returning to work and we have spent a bit of time exploring this." *Id.* Mr. Hartshorne informed Mr. Osborne that Leve's assignment for their next session was to explore and identify what needed to shift for her to feel comfortable enough to return to work. Mr. Hartshorne opined that Leve would continue to insist that she work out of her home, thus he was not going to spend too much time on that issue. Mr. Hartshorne opined Leve was employable but her long-term career direction was unclear and they would focus on this issue.

At this time, Leve had found an apartment near the zoo. She felt she could travel by bus and therefore not have to deal with acquiring her driver's license, a goal she was not moving toward. Mr. Hartshorne noted that, although Leve was aware that she would have to pay rent, he did not feel she had thought about this on a practical level since a home business would take time to produce profits compared to a job. In conclusion, Mr. Hartshorne opined "Kristin remains a disconcerting mix of maturity and immaturity, fear and confidence, realism and fantasy, all of which make her a challenging case." *Id.*

On **May 16, 2001**, Leve had her therapy session with Ms. Shurter.  Tr. 463.  Ms. Shurter reported Leve appeared stressed and more depressed than in recent sessions.  Leve reported having many things going on that were overwhelming her.  Ms. Shurter assisted Leve in breaking things into doable tasks and enlisting help.  Ms. Shurter referred Leve to Cary Thomas for assistance in finding resources to cover her needs.

On **May 21, 2001**, Mr. Thomas submitted the paper work needed in order for Leve to receive her medications at no cost to her.  Tr. 462.

On **May 22, 2001**, Leve met with Dr. Smith.  Tr. 461.  Leve reported not having Zoloft. Dr. Smith called the pharmaceutical representative and obtained samples for Leve until she received her free medications from Mr. Thomas' source.

On **May 30, 2001**, Leve met with Ms. Shurter.  Tr. 459.  Leve reported feeling less stressed about the move to Albuquerque.  Ms. Shurter instructed Leve to continue therapy at RRFHC until she transferred to UNM-MHC.

On **June 1, 2001**, Mr. Hartshorne reported Leve had two counseling sessions in May.  Tr. 431.  Mr. Hartshorne indicated Leve was working on handling her fear of a "public breakdown." *Id*.  Mr. Hartshorne directed Leve to use her skill of shifting into her adult ego-state which she could do quite well to handle this fear.  Mr. Hartshorne also referred Leve to the Department of Labor to take the CHOICES program, a computerized career guidance program.  Mr. Hartshorne felt that the last session with Leve should be spent identifying some long-range career options which would motivate her to look beyond the scariness of the next step to the ultimate objective, getting a job.

Mr. Hartshorne informed Mr. Osborne that Leve was doing a good job of holding on to her adult ego-state and moving forward in those areas where she felt relatively safe, e.g., doing things with friends and getting out of Rio Rancho, and exploring moving into an apartment.  Tr. 431.  Mr. Hartshorne reported that  Leve still wanted to work at home but had done nothing about it.  Mr. Hartshorne stated he could not "clearly envisage (sic) how she [was] going to pull off her own apartment at this point without sustained financial assistance from her mother."  *Id.*

On **June 7, 2001**, Leve failed to keep her appointment with Dr. Smith.  Tr. 457.

On **June 14, 2001**, Dr. Smith evaluated Leve.  Tr. 456.  Leve reported she had been so busy that she forgot about her last appointment with Dr. Smith.  Leve expressed her optimism regarding her move to Albuquerque and informed Dr. Smith she would continue at RRFHC until she established residency and could go to UNM-MHC.

Dr. Smith noted Leve appeared mildly anxious and euthymic.  Tr. 456.  Leve reported she was sleeping well and denied suicidal ideation.  Dr. Smith noted Leve was compliant with her medications and continued her on Zoloft.

On **June 28, 2001**, Leve met with Ms. Shurter.  Tr. 455.  Leve reported being busy preparing for the move to Albuquerque.  Leve continued seeing Mr. Hartshorne and was receiving her medications from RRFHC until she could be seen at UNM-MHC.

On **July 4, 2001**, Mr. Hartshorne reported counseling Leve only once in June.  Tr. 430.  Mr. Hartshorne noted Leve had missed her last two scheduled appointments.  Leve had moved to her apartment near the zoo and was considering being a docent there.  Mr. Hartshorne reported Leve was very excited by this prospect and felt it would be a "stepping stone" back into the world.  Leve reported she was going to begin doing odd jobs (babysitting, helping out friends)

48

because she was still "not ready to throw herself back into the world of work full-time as an employee." *Id.*   Mr. Hartshorne opined Leve's moving out on her own was the best step in moving her rehabilitation forward.

On **July 26, 2001**, Leve met with Ms. Shurter.  Tr. 453.  Leve reported being stressed "due to not finding work and needing to pay rent next month." *Id.*  However, Leve reported she was handling this fine and was adjusting to living alone.  Leve was still waiting to transfer to UNM-MHC.  On that day, Leve signed a Treatment Plan, requiring she continue to participate in weekly therapy with Mr. Hartshorne, continue to see Ms. Shurter on a monthly basis and continue to see Dr. Smith monthly for medication management.

Dr. Smith also evaluated Leve on July 26, 2001.  Tr. 451.  Leve reported she was not having problems sleeping, and she was handling stress with the aid of therapy.   Dr. Smith assessed Leve as "stable on medications" and instructed her to continue taking her medications.

On **August 8, 2001**, Mr. Hartshorne reported Leve had only been to one counseling session in July.  Tr. 429.  However, Leve had called on August 6 to schedule an appointment because she was very anxious about rent.  At the July session, Leve reported doing fairly well. However, Leve was stressed about moving into a different apartment in her apartment complex and was dealing with the attempted suicide by one of her friends.  Leve worked on anxiety management to help her regain her stability.  Leve also worked on job targets.  Mr. Hartshorne reported he had telephoned Leve, and she had reported that she liked her job developer and was excited about attending a Tibetan Buddist Monk ceremony.

On **August 22, 2001**, Mr. Thomas noted his efforts to coordinate Leve's community services in Albuquerque to assist Leve in the payment of her rent.  Tr. 450.  Mr. Thomas found

49

that many agencies were out of money or required a six month residency.  Mr. Thomas suggested Leve check with Noon Day Ministries for volunteer work in exchange for assistance.

On **August 23, 2001**, Leve met with Dr. Smith.  Tr. 449.  Leve stated  "barely getting along . . . it's this whole situation of moving out on my own . . . and the financial problems that go with it and anxiety attacks."  *Id.*  Dr. Smith noted Leve frequently sighed and was restless but noted Leve realized most of her symptoms were related to situational problems.  Dr. Davis prescribed Ativan for short term use and instructed her to return in one month.

On the same day, Leve met with Ms. Shurter.  Tr. 448.  Ms. Shurter noted Leve appeared downhearted because of Mr. Thomas' inability to find her money for her rent.  However, she was relieved that her utilities were taken care of by his efforts.  Leve reported she had to come up with two months rent or move out, and she had no place to go.  Ms. Shurter gave Leve two numbers for halfway-type housing.  Ms. Shurter opined Leve had been coping very well considering the situation.

On **August 30, 2001**, Mr. Thomas called Leve and provided her with several numbers to agencies that could help her with housing.  Tr. 447.  Leve told Mr. Thomas that she had not gone to Noon Day Ministries because she wanted to leave them as a last resort.  Mr. Thomas noted Noon Day Ministries "was very likely to offer assistance through volunteer work."  *Id.*  Leve also informed Mr. Thomas she would not follow through on his advice that she call Barrett House "because a group home would be a step back for me."  *Id.*

On **September 5, 2001**, Mr. Hartshorne reported meeting with Leve on August 10, 2001, because she "was in major rent anxiety."  Tr. 428.  Leve worked on centering exercises and felt better.  Leve was now excited about working as a hotel/motel front desk clerk since she had done

this type of work before.  Mr. Hartshorne opined this would be "an excellent placement for her."
*Id.*  Mr. Hartshorne also noted Leve was "making a major effort to obtain financial assistance
from government agencies."  *Id.*  Leve's goal was to be employed by mid-September.  Mr.
Hartshorne noted Leve had not voiced any resistance to working, but she was still frightened that
she would not be able to handle work and would let people down.  Mr. Hartshorne recommended
counseling support for this problem.  Mr. Hartshorne reported Leve had made a great effort to
achieve independence.

On **September 27, 2001**, Dr. Smith evaluated Leve for the last time before transferring
her care to UNM-MHC.  Tr. 446.  Leve reported no new symptoms.  Dr. Davis noted Leve's
depressive and anxiety symptoms were controlled with medications.  Dr. Davis issued Leve her
last bottle of Zoloft and noted she still had Ativan which she seldom used.  Dr. Davis closed
Leve's case.

On the same day, Leve met with Ms. Shurter.  Tr. 445.  Leve reported doing "pretty well
in spite of many stressors."  *Id.*  Leve reported her rent had been covered by DVR, and she was in
the process of finding a job.  Ms. Shurter directed Leve to call UNM-MHC to set up an
appointment to transfer her care.  Ms. Shurter scheduled Leve for an appointment with the
understanding that it be canceled if UNM-MHC accepted her case.

On **October 3, 2001**, Mr. Hartshorne reported he had met with Leve on September 14 for
the final session authorized by DVR.  Tr. 427.  Mr. Hartshorne indicated Leve was excited about
a research job at A.C. Nielson.  Mr. Hartshorne had discussed the job development process with
Leve.  Leve inquired about the process and what each person's role was and what their
responsibilities were.  Mr.Hartshorne suggested she take full responsibility herself for getting a

job.  Mr. Hartshorne noted Leve had some good job targets and expected she would find a job soon.

On **October 29, 2001**, Leve met with Ms. Shurter.  Tr. 441-442.  Leve reported that for the past three weeks she had felt increasingly depressed, was sleeping less and had decreased energy.  Leve reported she had been unmotivated to follow through on services with UNM-MHC.  Ms. Shurter had Leve call UNM-MHC from her office.  Leve agreed to call Ms. Shurter if she would begin services at UNM-MHC before their next scheduled monthly appointment.

On **November 26, 2001**, Leve called Ms.Shurter to cancel her appointment due to lack of transportation.  Tr. 440.

**h.  Records for 2002**

On **January 2, 2002**, Leve sought care at HealthCare for the Homeless.  Tr. 519.  Leve had been evicted from her apartment and was seeking housing and services.  Leve reported her General Assistance and her SSI were pending.  The social worker noted DVR had paid for three months rent and utilities and Leve was still a DVR client.  The social worker assessed Leve as "tearful and depressed" with no plan to hurt herself.  The social worker referred Leve to a physician, gave her a housing application, and instructed her to return the following Monday.   On the same day, Leve received enough medication for one week.  Tr. 517.

On **January 3, 2002**, Ms. Shurter completed a Discharge/Transfer Summary.  Tr. 439.  Leve was transferring to UNM-MHC.  Tr. 439.  Ms. Shurter noted Leve's level of functioning was "moderate-good."  Tr. 439.

On **January 7, 2002**, Leve returned to HealthCare for the Homeless for her follow up. Tr. 518.  Leve reported she had moved in with her mother until she could be placed at Barrett House.  Leve was directed to return the following day for more Zoloft.

On **January 8, 2002**, returned to HealthCare for the Homeless.  Tr. 517.  The physician noted Leve did well with Zoloft and continued her on 100 mg daily.  The mental status examination indicated Leve was relaxed, well spoken, affect was appropriate, she had good eye contact, appetite and energy level were fine, and there was no psychomotor retardation.  The physician diagnosed Leve with depression and post-traumatic stress disorder by history.  The physician prescribed Zoloft and reminded Leve to keep her appointment with Dr. Hammond on February 4, 2002.

On **January 12, 2002**, Dr. Jill Blacharsh, a psychiatrist with HealthCare for the Homeless, evaluated Leve.  Tr. 516.  By this time, Leve was staying at Barret House.  Dr. Blacharsh diagnosed Leve with "recurrent major depression (? + Dysthymic disorder v. residual chronic) plus anxieity disorder NOS, plus history of PTSD."  *Id.*  However, Dr. Blackharsh found no evidence for Personality Disorder diagnosis.  Dr. Blacharsh increased Leve's Zoloft dosage and canceled her appointment with Dr. Hammond.  Dr. Blacharsh assigned Leve a GAF score of 55 (moderate symptoms).

On **January 23, 2002**, Leve returned to HealthCare for the Homeless for a two week supply of Zoloft (100 mg twice a day) and Elavil (50 mg at bedtime).  Tr. 515.

On **January 24, 2002**, Leve met with a counselor at Healthcare for the Homeless.  Tr. 515.

On **February 7, 2002**, Leve met with Dr. Blacharsh.  Tr. 515.  Dr. Blacharsh noted Leve was in emergency housing but her case manager was working on permanent housing.  Dr. Blacharsh opined Leve was responding to the increased dosage of Zoloft and would therefore leave her on that dose for another three weeks.  Dr. Blacharsh instructed Leve to return in three weeks or as needed.

On **February 21, 2002**, Leve returned to HealthCare for the Homeless for her annual gynecological examination.  Tr. 511.  The nurse practitioner did a pap smear and instructed Leve to return in one week.

On **February 28, 2002**, Dr. Blacharsh evaluated Leve.  Tr. 511.  Dr. Blacharsh noted Leve was doing well with her depression.  Leve stated she was pleased her case manager was working on more permanent housing.  Leve had no specific concerns on that day.  Leve had received dental and medical care.  Dr. Blacharsh noted "Well groomed, good eye contact, joking (at times euthymic . . . .)."  *Id.*  Dr. Blacharsh assessed Leve as "Recurrent major depression plus anxiety disorder NOS, depression in early remission."  *Id.*  Dr. Blacharsh made no changes to Leve's medications and instructed Leve to return in one month or as needed.

On **March 21, 2002**, Leve returned to HealthCare for the Homeless.  Tr. 509.  Leve wanted her pap smear results but the results were not available.

On **April 4, 2002**, Leve had blood drawn for a thyroid panel per Dr. Blacharsh's instructions.  Tr. 509.  Leve saw Dr. Blacharsh on that day for breakthrough symptoms.  Dr. Blacharsh recommended Leve increase her Zoloft dosage from 200 mg to 250 mg.

On **May 2, 2002**, Leve returned for her follow up visit with Dr. Blacharsh.  Tr. 509.  Leve was still complaining of some depression.  Leve requested Dr. Blacharsh write a letter to DHS regarding her diagnosis and treatment.

On **July 25, 2002**, Dr. Blacharsh wrote a "To Whom It May Concern" letter.  Dr. Blacharsh wrote:

> MS. LEVE IS DIAGNOSED WITH RECURRENT MAJOR DEPRESSION AND ANXIETY DISORDER NOT OTHERWISE SPECIFIED (INCLUDING FEATURES OF GENERALIZED ANXIETY DISORDER, OBSESSIVE COMPULSIVE DISORDER AND POSTTRAUMATIC STRESS DISORDER).  IT IS THIS COMBINATION OF DIAGNOSES THAT INTERFERES WITH MS. LEVE'S ABILITY TO WORK, IN PARTICULAR, BECAUSE OF A PREVIOUS EMOTIONAL BREAKDOWN AT WORK WITH HER LAST JOB, SHE HAS DEVELOPED POSTTRAUMATIC STRESS DISORDER SYMPTOMS AROUND WORK, INCLUDING NIGHTMARES, INTRUSIVE THOUGHTS, FEAR AND ANXIETY, AVOIDANCE AND HYPERAROUSAL.  SHE IS AWARE THAT THIS HAS BECOME A SIGNIFICANT PROBLEM AND WILL BE ADDRESSING IT IN THERAPY.  IN THE INTERIM SHE REMAINS UNABLE TO WORK.  I ANTICIPATE THAT THIS WILL LAST AN ADDITIONAL 6 MONTHS AT THE LEAST.

Tr. 535.

## 2. Analysis

The ALJ found Leve did not "establish a persistent limitation" and the record indicated "she was stable on medications."  Tr. 331-332.  Specifically, the ALJ found that the record as a whole did not establish an inability to work which persisted for a continuous 12-month period.  Tr. 331.  The ALJ also considered Dr. Blacharsh's letter and found it did not establish a persistent limitation and was at odds with the remainder of the record.  Ultimately, the ALJ found Leve was not disabled.

Having meticulously reviewed the evidence in this case, the Court finds that substantial evidence supports these findings.  An overview of the evidence reflects the following:

On November 30, 1995, Leve reported "the Desipramine is really allowing her to be stable," and her attending physician noted "no serious lasting depressive episodes."  Tr. 197.

On March 20, 1996, informed David Montoya, a Certified Vocational Evaluator, that although she suffered from depression, she had been stable for the last six to nine months.  Tr. 78. Mr. Montoya evaluated Leve and opined she was within the bright normal range and had demonstrated "a high degree of competence with regard to comprehending and following verbal instructions, produced work of good quality, exhibited excellent levels of productivity, attended well to all tasks presented, and appeared highly motivated."  Tr. 81.  By December 27, 1996, Leve's therapist opined Leve "continues to move forward."  Tr. 132.  Leve had expressed her pleasure at passing her GED tests and commented "my confidence is over ridden by my fears of taking too much on."

On January 31, 1997, Mr. Harbin, Leve's therapist noted Leve was able to "navigate her way thru crisis in a new manner that has allowed her to remain stable."  Tr. 131.  Leve started having problems in February when she lost her General Assistance.  On April 7, 1997, Mr. Harbin opined Leve had taken some very big steps in her treatment even though recent events (loss of her General Assistance and having to move in with her mother) suggested some backward movement. Tr. 128.

On January 29, 1998, Leve's attending physician noted she was "relatively stable."  Tr. 193.  Her mental status examination indicated she had fair eye contact, restricted and slightly angry mood, her thought process was organized, and her insight and judgment were good.  By April 2, 1998, Leve reported she "had not felt stable" on Paxil.  Tr. 184.  On April 6, 1998, Leve's attending physician documented 173 visits to UNM-MHC and questioned the diagnosis

and treatment Leve was receiving.  The physician stated Leve had been receiving individual

psychotherapy along with group therapy.

On May 13, 1998, Dr. Rene Gonzales evaluated Leve.  Tr. 150-153.  Leve incorrectly

informed Dr. Gonzales that she had not received any individual therapy.  Dr. Gonzales noted Leve

was "presently continuing to suffer depression and anxiety" and showing improvement with the

medication that is prescribed to her."  Tr. 150.-3

On May 18, 1998, Leve requested she be hospitalized at UNM-MHC.  Tr. 176.  Leve

reported being down and disappointed.  Tr. 177.  From May 28 to July 10, 1998, Leve

participated in the Partial Hospitalization Program.  Tr. 172.  She was admitted to help alleviate

her depressive symptoms and to increase her coping skills.  By July 14, 1998, Leve' attending

physician at UNM-MHC reported Leve's depression was "partially remitted."  Tr. 169.

On August 13, 1998, Dr. Lisa Feierman wrote a letter opining Leve's mental illness

prevented her from working full time.  Tr. 219.  On August 25, 1998, Dr. Kathryn Fraser wrote a

letter indicating "It has been difficult for [Leve] to accept that she may not be able to find work

that she finds rewarding and meaningful at this time."  Tr. 218.  Dr. Fraser also opined that

medications and therapy would help Leve and that DVR had been recommended to help Leve find

part-time employment while she continued with treatment.   Apparently, Dr. Fraser felt Leve

could handle working part-time while in treatment.

By November 3, 1998, Leve was excited about starting school.  Tr. 413.  On November

30, 1998, Leve reported she was working through DVR in the mental health office and reported

doing well on Zoloft.  Tr 233.  Dr. McCarty noted Leve was doing well overall.

On December 2, 1998, Leve reported that with DVR's assistance she was getting things in place on time and was feeling less stressed out.  Tr. 409.

In early 1999, Leve reported starting school at TVI.  Mr. Osborne noted Leve was in a very good mood on February 9, 1999.  Tr. 410.  On February 18, 1999, Dr. McCarty noted Leve was <u>doing well and was in school part-time</u>.  On that visit, Dr. McCarty opined Leve's <u>depression was in treated remission</u>.  Tr. 231.  On February 22, 1999, Leve reported school was going well.  Tr. 265.  Her therapist noted "<u>Going well in all areas</u>, nothing to work on at the moment."  *Id.*

On April 5, 1999, Leve had joined a horse club and was riding.  Tr. 264.  Leve's therapist reported she "<u>was able to control the self-defeating thoughts</u>."  *Id.*  On April 8, 1999, Leve met with her therapist and reported receiving an A and a B on some tests.  Tr. 410.  On this visit, Leve <u>expressed her satisfaction with her medications</u> and stated "this is the best medication has worked since she was diagnosed over 5 years ago with depression."  *Id.*  On April 23, 1999, Leve's therapist opined <u>she did not seem to need counseling at this time</u>."  Tr. 263.

On May 13, 1999, Leve reported she had <u>completed her classes at TVI with a 4.0 GPA</u>.  May continued to be a busy month for Leve <u>with no complaints</u>.

On June 8, 1999, Dr. McCarty assessed Leve as "<u>Depression– treated</u>.  Tr. 260.  Leve failed to keep her next three appointments in June.

In early 2000, Leve started to have more problems. In early February, Leve reported she had not been doing well.  However, by March 9, 2000, Dr. Rendall diagnosed Leve with <u>Major Depression Disorder, recurrent but about 60% improved on current medications</u>.  By May 10, 2000, Dr. Rendall noted <u>Leve was improving on medication</u> in spite of many stressors and noted "possible Dysthymic disorder rather than MDD."  Tr. 493.

On July 19, 2000, Dr. Rendall changed Leve's diagnosis to Dysthmic Disorder and noted <u>Leve was doing fairly well</u>. On September 6, 2000, Mr. Hartshorne also questioned why Leve was incapacitated as she appears to be or get.

On November 18, 2000, Leve reported being off her Zoloft for one month due to lack of funds. Tr. 501. At her insistence, Leve was hospitalized in order to get her back on Zoloft and stabilize her symptoms. However, by December 6, 2000, Mr. Hartshorne reported Leve had been discharged from her "self-hospitalization" and <u>had emerged stronger and more motivated</u>. Tr. 438.

On January 3, 2001, Leve reported doing better on her medications. Tr. 480. On January 10, 2001, Mr. Harshorne reported <u>Leve was doing very well with her medications</u>. Tr. 435. On January 31, 2001, Leve met with Ms. Shurter and reported her mood was up. Tr. 478. On January 31, 2001, <u>Leve reported she was sleeping better and her depression had improved</u>.

By February 7, 2001, Mr. Hartshorne reported Leve was "<u>in a stronger psychological position than several months ago, partly from Zoloft and partly from our work</u>." Tr. 434. In March, Leve's therapist felt she should take a break from therapy until she was "truly work ready." Tr. 433. Mr. Hartshorne suggested DVR provide counseling to assist Leve in an actual job search.

On May 1, 2001, <u>Leve reported feeling stable for the most part</u>. Tr. 464. By May 9, 2001, Mr. Hartshorne opined Leve would have little difficulty getting a customer service job based on the job skills she listed. Tr. 432. However, he also noted Leve had a block to returning to work. *Id.* Significantly, <u>Mr. Hartshorne opined Leve was employable</u>. *Id.*

On June 14, 2001, <u>Dr. Smith noted Leve was euthymic, sleeping well and compliant with her medication</u>. Tr. 456.  On July 4, 2001, Leve reported being excited and was going to begin doing odd jobs but was not ready to throw herself back into the world of work full-time.  On July 26, 2001, Leve reported being stressed "due to not finding work and needing to pay rent next month."  Tr. 453.  However, <u>she also reported doing fine and felt she was adjusting to living alone</u>.  <u>Id</u>.  On that same day, Dr. Smith noted Leve was "<u>stable on medications</u>."  Tr. 451.

In August of 2001, Leve begin to have more anxiety due to her inability to find funds to pay her rent.  Nonetheless, <u>Ms. Shurter opined Leve was coping very well</u>.  Tr. 448.  Although her case manager was very optimistic that Noon Day Ministries would provide Leve with  rent money in exchange for volunteer work, Leve failed to contact this agency.  Leve informed him this would be her last resort.

In early September of 2001, Leve was again excited about working as a hotel/motel front desk clerk.  Tr. 428.  On September 27, 2001, <u>Dr. Smith noted Leves depressive and anxiety symptoms were controlled with medications</u>.  Tr. 446.  On that same day, Leve met with <u>Ms. Shurter and reported she was doing pretty well in spite of many stressors</u>.  Tr. 445.

On October 3, 2001, Leve was again excited about a research job at A.C. Nielson.  Tr. 427.  <u>Mr. Hartshorne noted Leve had some good job targets and expected she would find a job soon</u>.  <u>Id</u>.

On January 2, 2002, Leve sought help at HealthCare for the Homeless. Tr. 519.  Leve had been evicted from her apartment and was seeking housing and services.  Leve was waiting for General Assistance and waiting to hear about her social security benefits.  She had moved in with her mother until someone could find housing for her.

60

On January 12, 2002, Dr. Blacharsh, a psychiatrist with HealthCare for the Homeless, evaluated Leve.  Tr. 516.  Leve continued to receive her medical and psychiatric care at HealthCare for the Homeless.  By February 28, 2002, <u>Dr. Blacharsh noted Leve was doing well with her depression</u>.  On this visit, <u>Dr. Blacharsh noted Leve was joking and was euthymic</u>.  Dr. Blacharsh assessed Leve's depression and anxiety as being in <u>early remission</u>.

As the Court has acknowledged, although there may be some evidence in the record which may tend to establish Leve's disability, the determinative conclusion is that there is also substantial evidence to support the ALJ's finding of no disability.  Again, it is not this Court's role on appeal from this agency determination to reweigh the evidence or to substitute its judgment for that of the Commissioner.  *See Hargis*, 945 F.2d at 1486.  Based on the record as a whole, the Court finds that Leve failed to establish a severe mental impairment that has lasted for a continuous period of twelve months which prevented her from engaging in substantial gainful activity.  The record as a whole also supports the ALJ's RFC finding and his determination that Leve "retains the capacity for work that exists in significant numbers in the national economy and is not under a 'disability' as defined in the Social Security Act."  Tr. 333.  Additionally, the ALJ properly found that Dr. Blacharsh's letter was at odds with the record as a whole and did not establish that Leve was unable to work for a continuous twelve month period.

Finally, Leve argues that "the ALJ based his decision on the vocational expert's testimony which was derived from the ALJ's defective hypothetical as his residual functional capacity finding was erroneous."  Pl.'s Mem. in Supp. of Mot. to Reverse at 10.  The Court  already has ruled that the ALJ's RFC finding is supported by substantial evidence and need not address this argument.  Accordingly, the Court finds that the ALJ's decision adheres to applicable legal

standards and that substantial evidence supports the ALJ's determination that,  despite her

limitations, Leve could perform a significant number of jobs that exist in the national economy.

    A judgment in accordance with this Memorandum Opinion will be entered.


_____

**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**